1
2
3
4                           UNITED STATES DISTRICT COURT
5                                 DISTRICT OF NEVADA
6                                       * * *
7    UNITED STATES OF AMERICA,                    Case No. 2:08-cr-00164-KJD-GWF
8                               Plaintiff,                  2:17-CV-0759-KJD
9          v.                                              ORDER
10   JUSTIN SPENTZ,
11                              Defendant.
12          Presently before the Court is Defendant's Motion to Vacate, Set Aside, or Correct

13   Sentence under § 2255 (#371). The Government filed a response in opposition (#379) to which

14   Defendant replied (#383). The parties also filed multiple supplements

15   (#389/391/394/402/418/421/426). Also, before the Court is Defendant's Emergency Motion for

16   Decision Due to Covid-19 Pandemic (#429).

17   I. Background

18          This case arose out of a Bureau of Alcohol Tobacco and Firearms ("ATF") undercover

19   operation in a tattoo shop. In September 2007, ATF opened the undercover storefront operation

20   in Las Vegas. See Trial Transcript, ECF No. 264 (2/16/10 trial tr.) at 33-34. As criminals came

21   into the business, a functioning tattoo shop, the agents would identify particularly dangerous

22   individuals—those involved, for example, in residential burglaries and armed robberies—and

23   propose to them a dangerous criminal opportunity. Id. at 38-39. An undercover agent posing as a

24   disgruntled drug courier would tell the targets about a stash house containing a large quantity of

25   cocaine. Id. at 38; ECF No. 261 (2/17/10 trial tr.) at 16. The agent would propose that the target

26   rob the stash house, steal the drugs, and split the proceeds with him. ECF No. 264 at 38. ATF

27   Special Agent Peter McCarthy assumed the undercover role of the tattoo shop owner. Id. at 32,

28   34.

In February 2008, a confidential informant introduced McCarthy to Reed. Id. at 36. Reed sold McCarthy a loaded, .25-caliber pistol, and said he could get more. Id. at 36-37. Based on his conversations with Reed and on information he had obtained that Reed was involved in a series of residential burglaries and had been arrested for conspiracy to commit armed robbery, McCarthy decided to approach Reed with the "stash house" robbery story. ECF No. 264, at 39-40.

On April 17, 2008, Reed came to the tattoo shop to meet with McCarthy. Id. at 41-42. Of his own initiative, Reed brought Defendant Spentz with him. Id. at 42-44. McCarthy brought the men into his small back office and introduced them to ATF Special Agent Richard Zayas, who played the undercover role of the disgruntled drug courier. Id. at 40-42. While waiting for Zayas to arrive, McCarthy told Reed and his friends that whether they decided to work with Zayas or not was up to them. Id. at 48-49.

Zayas first told the men that he was going to explain the situation to them, and that if they were not interested, everyone could go their own way as if they had never met. ECF No. 261 at 16. Zayas said he worked as a courier for a Mexican drug organization, but that he was upset because he was being underpaid, and he wanted to steal their cocaine. Id. at 28. Zayas said when he arrives at the stash house to collect the six to seven kilograms of cocaine that he delivers, there are always two men in the house, one of whom always has a gun. Id. at 21. He said the armed man stays with him, while the other man goes into a room in the back of the house to get Zayas's delivery. Id. at 21. Zayas also said that he always sees a large amount of cocaine—between 22 and 39 kilograms—packaged in bricks on a table in the front room of the house. Id. at 21-22. Zayas said the location of the stash house changes, and that he does not know the address until the drug traffickers call him right before he goes to pick up his delivery. Id. at 22.

After explaining the scenario, Zayas asked whether this was something Reed could handle. Id. at 32. Reed said that he could handle it and proceeded to formulate the plan of how he would commit the robbery. Id. at 33-35. Reed said they would lay Zayas and the other men on the floor and steal the cocaine, id. at 35, and that if the other men "make a false move, it's our turn to go and do what we got to do." Reed said, "we got the utilities to take care of it," and told

Zayas he had a "burner with a silencer." Id. at 35, 41. Reed reiterated that they would "beat [the drug dealers'] ass[es]... and if they make false moves, we do what we got to do."  Gov't Exh. 2A. Throughout the conversation, Spentz sat on a couch next to Reed, saying nothing; he did not react or act surprised when Reed emphasized that they would beat the drug dealer's asses and they would "do what we got to do" if they made a false move.

The meeting ended with Zayas and Reed agreeing to get together in person around May 12, when Zayas said he would learn the date of the next drug delivery. Reed called McCarthy on May 8 to confirm that the plan was still on. ECF No. 264, at 52-53. Zayas met with Reed again on May 12 and met with Reed and co-conspirator Jackson on May 14. Id. at 56-57; ECF No. 264, at 57-58, 61. At the meeting on the 14th, Reed agreed to meet Zayas with his co-conspirators the next day to commit the robbery. ECF No. 264 at 76-77.

The next day, Reed and his three co-defendants (Jackson, Spentz and Golden), arrived at the Ice House parking lot as planned. ECF No. 264 at 81. Reed and Jackson arrived in a red Chevy Blazer, followed by Spentz and Golden in a white Nissan. Id. Zayas, McCarthy, and Agent Gomez (who had been playing the undercover role as McCarthy's sidekick), huddled with the defendants. ECF No. 264 at 81, 86, 91-92. Zayas asked Reed whether he had explained to Spentz and Golden that one of the two men at the stash house was armed; Reed said he had. ECF No. 261 at 54.

Zayas explained the entire scenario again, and asked "is that cool?" ECF No. 264 at 92. Reed responded "That's cool," and Golden said "yeah," and Spentz nodded affirmatively. ECF No. 264 at 92-93. The agents told the defendants that the rental vans were waiting at a nearby location, and the agents and the defendants drove in tandem to that location. ECF No. 264 at 93.

When they arrived at the warehouse and exited their cars, Zayas gave the predetermined signal, and an ATF tactical team moved in and arrested the defendants. ECF No. 261 at 64- 65. Agents recovered a Glock semiautomatic pistol with an extended magazine loaded with 32 rounds, in the Nissan; and a Taurus PT145 semiautomatic pistol, loaded with eight .45- caliber hollow-point rounds, in the center console of Reed's Chevy Blazer. Id. at 7-79, 84-86.

II. Procedural Background

On December 17, 2019, a jury convicted Spentz and Golden (co-conspirator Reed was tried separately) of conspiracy to commit Hobbs Act robbery (Count One), conspiracy to possess with the intent to distribute cocaine (Count Two) ("the drug trafficking conspiracy") and possessing, aiding and abetting possession of a firearm in furtherance of either the drug trafficking conspiracy or the Hobbs Act conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three). On March 24, 2010, the Court sentenced Spentz to 192 months custody: 132 months on Count One, 132 months on Count 2 concurrent, and a consecutive 60 months on Count Three.

Spentz filed a court-authorized successive section 2255 motion in 2016, seeking relief based on the Supreme Court's June 2015 decision in Johnson v. United States, 135 S. Ct. 2551, 2557 (2015), which held that the residual clause in the definition of a "violent felony" in the Armed Career Criminal Act of 1984, 18 U.S.C. § 924(e)(2)(B) ("ACCA"), is unconstitutionally vague. Spentz argued, among other things, that Johnson's holding also invalidated the "residual clause" in the definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B), and that the conspiracy to commit Hobbs Act robbery offense that served as one of the predicates for his section 924(c) conviction did not qualify as a crime of violence.

The government responded that Spentz did not meet the requirements for successive § 2255 motions; and that Johnson did not invalidate section 924(c)(3)(B). ECF No. 377. Although the government was correct that Johnson did not invalidate section 924(c)(3)(B)—a conclusion the Ninth Circuit later confirmed, see United States v. Blackstone, 903 F.3d 1020 (9th Cir. 2018)—the Supreme Court's more recent decision in United States v. Davis, 139 S. Ct. 2319 (2019), did. The government agrees with Spentz that, as a matter of judicial efficiency, the Court should decide the present motion on its merits (after considering the parties' arguments in the supplemental pleadings), rather than dismissing the present motion as untimely and requiring Spentz to start over with a section 2255 motion based on Davis. The Court agrees.

III. Analysis

Essentially, Defendant contends that his § 924(c) conviction for using a firearm during

and in relation to a crime of violence is void because the "crime of violence" element is not satisfied.  The parties agree that conspiracy to commit Hobbs Act robbery no longer qualifies as a crime of violence after <u>Davis</u>. Therefore, unless Spentz's conviction for conspiracy to possess with the intent to distribute cocaine (Count Two) is enough to satisfy the requirements of § 924(c), the Court must vacate Defendant's conviction on Count Three and resentence Defendant without the sixty (60) month consecutive sentence.

With respect to Count Three, the Court instructed the jury—without objection—that it could convict Spentz if it found beyond a reasonable doubt that he or a co-conspirator possessed a firearm during and in relation to either the Hobbs Act conspiracy *or* the drug trafficking conspiracy. ECF 132, p. 19-22. Now that the residual clause of § 924(c) is invalid, Spentz argues that the conviction on Count Three is invalid, because the jury issued a general verdict that did not specify which of the conspiracies the jury relied on when finding him guilty of Count Three. <u>See</u> <u>Zant v. Stephens</u>, 462 U.S. 862, 881 (1983) (<u>Stromberg</u> requires that a general verdict must be set aside if the jury was instructed that it could rely on any two grounds, and one of the grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground).

<u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 58 (2008), agrees that a conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories and may have relied on an invalid one However, it also instructs that such errors are subject to harmless error review. <u>Id</u>. at 60. In fact, errors to which harmless error analysis does not apply are the exception and not the rule. <u>Id.</u>at 61.

The error is subject to the harmless error standard set for the in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993), under which the reviewing court asks whether the flaw (in this case the inclusion of the conspiracy to commit Hobbs Act robbery as a predicate offense for the 924(c) violation) in the instruction "had a substantial and injurious effect or influence in determining the jury's verdict." The proper harmless error standard is defined by <u>Neder v. United States</u>, 527 U.S. 1, 7-8 (1999). <u>See</u> <u>Hedgpeth</u>, 555 U.S. at 18. The Court must determine whether it was "clear beyond a reasonable doubt that a rational jury would have found the defendant

1    guilty absent the error." <u>Neder</u>, 527 U.S. at 7-8. Therefore, the Court must conduct a thorough

2    examination of the record to determine "whether the record contains evidence that could

3    rationally lead to a contrary finding with respect" to the error. <u>Id.</u> at 19.

4            Here, the evidence clearly shows that the robbery conspiracy is inextricably intertwined

5    with the drug trafficking conspiracy. The conspiracy had one goal: steal the cocaine and resell it.

6    This was a one-time event. The guns at issue were not used in a string of robberies but were

7    stolen or purchased without background checks and used for one purpose, to facilitate the theft of

8    the cocaine. The jury was properly instructed on the elements of the drug trafficking conspiracy

9    and the jury found Spentz unanimously guilty of the charged drug trafficking conspiracy. There

10   were no notes from the jury evincing confusion about the jury instructions or what elements were

11   necessary to convict on the drug trafficking conspiracy.

12           In this case, the two predicate crimes were co-extensive. It is not a case where, for

13   example, defendant was convicted of two robberies committed at different times and places and

14   the 924(c) count was predicated on both robberies. In that case, the jury's general verdict on the

15   924(c) count would not mean it necessarily found the defendant possessed the firearm during and

16   in relation to both robberies. Because the present conspiracies were co-extensive, both limited in

17   time, location and scope, the Court cannot conclude that the instructional error led the jury to

18   convict based solely on the invalid predicate (conspiracy to commit Hobbs Act robbery). In fact,

19   based on the evidence and the conviction based on the drug trafficking conspiracy, no rational

20   fact finder could have found Defendant's conviction for the 924(c) violation was based solely on

21   the conspiracy to commit Hobbs Act robbery. This is not a case where the Court "is in grave

22   doubt as to the harmlessness of an error that affects substantial rights." <u>O'Neal v. McAninch</u>, 513

23   U.S. 432, 445 (1995) (citing <u>Kotteakos v. United States</u>, 328 U.S. 750, 764-65 (1946)).

24   Accordingly, Movant's petition is denied.

25   <u>IV. Conclusion</u>

26           Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Vacate, Set Aside,

27   or Correct Sentence under § 2255 (#371) is **DENIED**;

28           IT IS FURTHER ORDERED that Defendant's Emergency Motion for Decision Due to

Covid-19 Pandemic (#429) is **DENIED as moot.**

Dated this 30th day of September 2020.

Kent J. Dawson
United States District Judge